IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TEXAS STATE BOARD OF DENTAL EXAMINERS, | § § § | |
| Plaintiff, | § § | |
| v. | § § | No. 3:24-CV-528-BW |
| JOHN DOE, DDS | § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

The Texas State Board of Dental Examiners (the "Board") filed a petition requesting a court order under 42 U.S.C. § 290dd-2(b)(2)(C) authorizing the disclosure of substance abuse treatment records pertaining to a licensed dentist. (*See* Dkt. No. 1.) Defendant, appearing in this action under the pseudonym John Doe, DDS, has appeared through counsel and filed an answer to the petition. (Dkt. No. 11.) This action has been transferred to the undersigned magistrate judge to conduct all proceedings, including entry of judgment, under 28 U.S.C. § 636(c) in accordance with the parties' consent. (*See* Dkt. Nos. 15 at 4, 17.)

Dr. Doe filed a motion in limine (Dkt. No. 32) on November 25, 2025. The Board filed its response (Dkt. No. 36) on December 3, 2025. On December 10, 2025, the Court held non-public hearings on Dr. Doe's motion and the Board's petition. (Dkt. Nos. 38, 39.) The Court sets out in this memorandum opinion its findings of

-1-

fact and conclusions of law under Fed. R. Civ. P. 52(a)(1).[1]  For the reasons that follow, the Court grants the Board's petition in part and denies it in part.

## I.

The Board is the state agency responsible for regulating the practice of dentistry in Texas, including the issuance and management of licenses and the discipline of licensees.  (Tr. 46-47.)[2]  Doe has been a licensed dentist for more than 30 years.  (Tr. 23, 44.)  Dr. Doe is informally retired and has not seen patients since the events underlying this action occurred; because he has not submitted the necessary paperwork to formally retire, he could choose to resume treating patients at any time.  (Tr. 23-25, 60-61.)

In 2021, the Board received two complaints regarding substance use by Dr. Doe.  (Tr. 52.)  One complaint came from an undisclosed member of the public.  (Tr. 66-68.)  The other was received from Professional Recovery Network ("PRN"), a peer-assistance program that facilitates and monitors substance abuse treatment and mental health care for dentists and certain other licensed professionals in Texas.  (Tr. 53-54.)  PRN creates plans and "basically put[s] guardrails in place for practitioners who are struggling with substance abuse or mental health."  (Tr. 54.)  The Board

---

[1] The parties have not addressed the burden of proof applicable to these proceedings. Unless otherwise stated, all factual findings are based upon a preponderance of the evidence.

[2] The Court has used a rough transcript of the December 10 hearing to prepare these findings and conclusions.

looks to PRN to advise it with respect to whether a licensee is safe to practice, with or without limitations.  (Tr. 54.)

On October 15, 2021, Will Turney, a PRN social worker, sent a letter to the Board's general counsel reporting that Dr. Doe had been discharged from PRN for noncompliance with its program.  (Exh. 1 at 7.)[3]  He stated that Dr. Doe self-referred to PRN on July 8, signed a contract with PRN on September 22, and then terminated his contract on October 13.  (Exh. 1 at 7.)

According to the information reported in Turney's letter, a therapist at Enterhealth, an inpatient treatment facility, called Turney on July 8 inquiring about PRN's services because she wanted to help a dentist patient "with protecting his license."  (Exh. 1 at 7.)  Turney recommended that the patient call him for an intake interview.  (Exh. 1 at 7.)  Dr. Doe called him later that day and completed the intake.  (Exh. 1 at 7.)  During his call with Turney, Dr. Doe disclosed that he had used small amounts of methamphetamine "medicinally" each morning for five years, that he had last used it a couple of weeks before the call, and that he had admitted his drug use to his dental assistants.  (Exh. 1 at 7.)  He stated that his dental assistants helped him find inpatient treatment.  (Exh. 1 at 7.)  Dr. Doe also reported that he once had an alcohol problem—including a DWI arrest decades earlier—but quit drinking in 2011 without any treatment.  (Exh. 1 at 7.)  He disclosed having taken "too much"

---

[3] The Board's exhibits bear sequentially paginated bates stamps in the upper-left corner.  During the hearing, the parties referred to particular pages of the exhibits using the bates numbers, and the Court does the same for consistency.

valium in the 1980s before he ultimately quit that substance too, again without treatment. (Exh. 1 at 7.) Dr. Doe told Turney of additional recreational drug use from the 1970s to the 1990s and stated he had never received treatment before going to Enterhealth. (Exh. 1 at 7-8.)

Turney's October letter to the Board contained additional details about Dr. Doe's treatment at Enterhealth, including treatment providers' evaluations of his participation, fitness to practice dentistry, and recommendations for treatment. (Exh. 1 at 8.)

On September 3, PRN sent Dr. Doe a PRN Support Agreement for his signature. (Exh. 1 at 9.) Dr. Doe did not immediately sign it. On September 14, Turney sent a follow-up letter advising Dr. Doe that PRN would "look into reporting him to [the Board]" if he did not return the signed agreement by September 21. (Exh. 1 at 9.) On September 20, Dr. Doe called Turney to say he was not planning to sign the agreement, expressing his belief that the "penalties" were disproportionately harsh for his conduct. (Exh. 1 at 9.) Dr. Doe left a message for Turney the following day asking to extend the deadline for returning the agreement, explaining that he needed time to think about whether he wanted to practice dentistry and requesting that his participation in an intensive outpatient program be considered sufficient while he pondered the issue. (Exh. 1 at 9.) Turney called Dr. Doe back on September 22, insisting that he sign the PRN agreement notwithstanding his ongoing treatment because PRN is the method by which the

Board ensures that its licensees are safe to practice.  (Exh. 1 at 9.)  Dr. Doe signed the agreement later that day.  (Exh. 1 at 9, 10-16.)

The agreement stated that Dr. Doe entered into the agreement "as of September 3, 2021."  (Exh. 1 at 10.)  By its provisions, Dr. Doe agreed to enter the PRN program and comply with its terms; he also acknowledged that PRN is a monitoring program and does not provide health care or mental health counseling. (Exh. 1 at 10.)  In relevant part, the agreement authorized any physician, treatment center, clinic, or other healthcare provider to disclose reports to PRN for the purpose of monitoring his progress in the program and compliance with the agreement. (Exh. 1 at 14.)  Additionally, if Dr. Doe did not comply with the program, the agreement authorized PRN to forward "any relevant information and records pertaining to [Dr. Doe's] participation in the program" to the appropriate licensing board.  (Exh. 1 at 14.)

Turney's October 15 letter to the Board appears to have attached the PRN Support Agreement signed by Dr. Doe and a document prepared by Enterhealth, the contents of which have been redacted for these proceedings and unseen by the Court. (*See* Exh. 1 at 17-18.)  The PRN letter also stated that Dr. Doe called Turney on October 13, 2021, to report that he wanted to terminate the PRN agreement.  (Exh. 1 at 9.)

Having received Turney's letter, the Board convened an emergency meeting of the executive committee by phone to consider, based on its assessment that Dr.

Doe's continued practice of dentistry would constitute a "clear, imminent, or continuing threat to person's physical health or well-being," whether his license should be temporarily suspended. (*See* Exh. 1 at 1.) The Board subsequently filed a petition seeking the temporary suspension of Dr. Doe's license. (Exh. 1 at 2.) The agency alleged in its petition that Dr. Doe was addicted to, or habitually intemperate in the use of, alcoholic beverages or drugs, that he refused to comply with a law relating to the regulation of dentists, and that he was physically or mentally incapable of practicing in a manner that is safe for his patients. (Exh. 1 at 2.) The executive committee voted to impose the temporary suspension. (Exh. 2 at 24.) A temporary suspension is effective for 30 days. (*See* Tr. 48, 65, Exh. 2 at 24.)

After securing the temporary suspension, the Board filed a formal complaint before the State Office of Administrative Hearings ("SOAH") requesting a hearing to show probable cause for the continued suspension of Dr. Doe's license. (Exh. 2 at 24.) During the course of those proceedings, Enterhealth filed a motion to quash two subpoenas served on counselors employed by the treatment center. (Exh. 4 at 37.) An administrative law judge ("ALJ") of the SOAH granted the motion after determining that the counselors' testimony would require them to disclose information deemed confidential under federal law. (Exh. 4 at 37.) The ALJ determined that the counselors could not be compelled to testify absent an order authorizing disclosure from a court of competent jurisdiction, which the SOAH was not. (Exh. 4 at 37.) Dr. Doe then moved to strike or limit the Board's other

evidence that was obtained in violation of the federal confidentiality laws. (Exh. 4 at 38.) Specifically, Dr. Doe sought to exclude Turney's testimony describing information he received from Enterhealth and from Dr. Doe during their intake phone call. (Exh. 4 at 38-39.) The ALJ concluded that Turney could not testify about what he learned from Enterhealth employees, and a letter disclosing such information would be inadmissible, because, like the quashed counselor subpoenas, it would require the disclosure of confidential information protected under federal law. (Exh. 4 at 39.) The ALJ additionally determined that, based on state law, the Board could not present evidence of substance abuse treatment through PRN. (Exh. 4 at 39.)

The Board subsequently initiated the instant proceedings. (Dkt. No. 1.) Dr. Doe has appeared through counsel and answered the petition. (Dkt. No. 11.) The Board certifies that it served a copy of the petition on legal counsel for Enterhealth (*see* Dkt. No. 1 at 11), but Enterhealth has not appeared in this case.

The Court conducted an evidentiary hearing on the petition in closed proceedings. *See* 42 U.S.C. § 2.64(c) (requiring a hearing on the application for disclosure be held "in the judge's chambers or in some manner which ensures that patient identifying information is not disclosed to anyone other than a party to the proceeding, the patient, or the person holding the record"). The Board presented testimony from one witness, Ambika Sanchez, who is an assistant general counsel to the Board. (Tr. 46.) Prior to the hearing, Dr. Doe filed a motion to exclude the

Board's evidence obtained from Enterhealth or PRN.  (*See* Dkt. No. 32.)  The gravamen of his motion is that PRN unlawfully disclosed protected information to the Board because the PRN Support Agreement was procured under duress and PRN disclosed the information to the Board after he had terminated his participation in the PRN program.  (*See id.*)  The Board contends that testimony is not a "record" that must be protected under the relevant statute and, alternatively, that the testimony and evidence are from PRN or the Board, not Enterhealth, and are not protected records.  (Dkt. No. 36.)  The Court carried the motion with the hearing to rule on the admissibility of evidence in its findings and conclusions.[4]

## II.

Federal law creates a "strong presumption" against the disclosure of records pertaining to a patient's participation in a federally funded drug or alcohol treatment program.  *United States v. Cresta*, 825 F.2d 538, 551–52 (1st Cir. 1987).  Under 42 U.S.C. § 290dd-2(a), as relevant here, "[r]ecords of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse disorder . . . treatment [or] rehabilitation . . . shall . . . be confidential" except in certain circumstances and for certain uses.  Congress granted this significant level of

---

[4] Having told the parties that the Court would carry the motion in limine through the hearing, it instructed Dr. Doe's counsel to object to any witness testimony he believed conveyed information that was subject to exclusion.  (Tr. 31-32.)  He made no such objection to witness testimony, and the Court did not identify any excludable testimony sua sponte.

protection over treatment records to encourage people to seek and participate in treatment without fear that doing so would compromise their privacy. *Cresta*, 825 F.2d at 552. For this reason, courts have found that the "privilege should not be 'lightly abrogated'" and have perceived a need for "'the strictest adherence' to the confidentiality provision[.]" *Mosier v. Am. Home Patient, Inc.*, 170 F. Supp. 2d 1211, 1213 (N.D. Fla. 2001) (quoting *Fannon v. Johnston*, 88 F. Supp. 2d 753, 757, 758 (E.D. Mich. 2000)).

The statute authorizes disclosure of patient records based on the patient's consent or, as discussed below, pursuant to a court order. *See* 42 U.S.C. § 290dd-2(b). But absent these circumstances, it precludes the disclosure or use of a "record" or "testimony relaying the information contained therein" in any civil, criminal, administrative, or legislative proceedings against the patient. *Id.* § 290dd-2(c). This limitation specifically states that a record "shall not be entered into evidence in any . . . civil action before a Federal . . . court." *Id.* § 290dd-2(c)(1).

As noted, the statute allows a court to authorize the disclosure of patient records upon a certain showing. 42 U.S.C. § 290dd-2(b)(2)(C). It provides that records can be disclosed "[i]f authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor, including the need to avert a substantial risk of death or serious bodily harm." *Id.* In assessing whether good cause exists, it instructs a court to weigh "the public interest

and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services." *Id.*

The Secretary of the Department of Health and Human Services has promulgated regulations implementing this statute, *see id.* § 290dd-2(g), including 42 C.F.R. § 2.64, which applies to these proceedings. That regulation sets out procedures and criteria for obtaining a court order authorizing the disclosure of records for use for noncriminal purposes. It provides that any person having a legally recognized interest in the use or disclosure of records sought for use in a civil, administrative, or legislative proceeding may apply for a disclosure order in a standalone proceeding. 42 C.F.R. § 2.64(a). The patient and the entity holding the records must be given notice of the proceedings and the opportunity to respond to the application and submit evidence. *Id.* § 2.64(b). Before authorizing disclosure, a court must find good cause, which requires subsidiary findings that "other ways of obtaining the information are not available or would not be effective," *id.* § 2.64(d)(1), and that "the public interest and need for the use or disclosure outweigh the potential injury to the patient, the physician-patient relationship and the treatment services," *id.* § 2.64(d)(2).

A higher standard is applied to one subset of records. Under 42 C.F.R. § 2.63, a court may authorize the disclosure of "confidential communications made by a patient to a [qualifying treatment program] in the course of diagnosis, treatment, or referral for treatment only if," in relevant part, "[t]he disclosure is necessary to

protect against an existing threat to life or of serious bodily injury, including circumstances which constitute suspected child abuse and neglect and verbal threats against third parties." 42 C.F.R. § 2.63(a)(1).

As the applicant seeking disclosure in this case, the burden is on Board to establish good cause for the release of records. *See Cresta*, 825 F.2d at 552.

## III.

The Court first determines what evidence it may consider in assessing whether the Board has satisfied its burden to authorize the disclosure of treatment records. Dr. Doe asserts that, much like the ALJ did in the state administrative proceedings, this Court should exclude practically all the information about Dr. Doe's substance use or treatment because PRN received records that were disclosed to it in violation of § 290dd-2. Relying on dictionary definitions, the Board contends that its evidence does not contain "records" and, alternatively, that its evidence contains PRN's or the Board's information but does not convey Enterhealth records. (*See* Dkt. No. 36 at 3-4.)

The Board's argument that its evidence does not contain "records" is not well founded, because its dictionary definition of records does not control the meaning of that term. Rather, 42 C.F.R. § 2.11 defines "records" as

> any information, whether recorded or not, created by, received, or acquired by a part 2 program relating to a patient (e.g., diagnosis, treatment and referral for treatment information, emails, voice mails, and texts), and including patient identifying information, provided, however, that information conveyed orally by a part 2 program to a provider who is not subject to this part for treatment purposes with the

-11-

consent of the patient does not become a record subject to this part in the possession of the provider who is not subject to this part merely because that information is reduced to writing by that provider who is not subject to this part. Records otherwise transmitted by a part 2 program to a provider who is not subject to this part retain their characteristic as records in the hands of the provider who is not subject to this part, but may be segregated by that provider.

42 C.F.R. § 2.11.[5] This operative meaning of the word extends far beyond "[i]formation that is inscribed on a tangible medium or that, having been stored in an electronic or other medium, is retrievable in perceived form." (Dkt. No. 36 at 3 (quoting Black's Law Dictionary (12th ed. 2024))). And the Board's argument that its evidence contains no Enterhealth records overlooks the breadth of the operative definition. The statutory definition sweeps broadly by capturing "[a]ny information . . . created by, received, or acquired by a part 2 program *relating to* a patient[.]" 42 C.F.R. § 2.11 (emphases added). And it explicitly includes identifying information. *Id.* So, for example, Enterhealth's disclosure of Dr. Doe's participation to PRN might itself involve disclosure of a "record" as meant by § 290dd-2.

Applying this definition, the Court concludes that certain evidence presented by the Board does not derive from protected records. This includes information that Dr. Doe conveyed directly to Turney during the intake call. He, not Enterhealth, provided this information to PRN, including his identity, substance abuse history, and lack of prior treatment; it was not created by, received, or acquired by

---

[5] A part 2 program is a federally assisted program. *See* 42 C.F.R. § 2.11. The parties agree that Enterhealth is a part 2 program and PRN is not. (*See* Tr. 4-5.)

Enterhealth.  *See* 42 C.F.R. § 2.11.  Other information, however, clearly was created or acquired by Enterhealth and repeated by PRN, including the information in the treatment center's discharge documentation detailing Dr. Doe's treatment participation and therapists' recommended limitations on his dental practice.  (*See* Exh. 1 at 8-9.)  Unless there is a recognized exception to confidentiality, this kind of information cannot be considered by the Court in determining whether good cause has been shown.  *See* 42 U.S.C. § 290dd-2(c)(1).

One such exception is written consent.  *See* 42 U.S.C. § 2290dd-2(b)(1)(A). The Board submitted the written PRN Support Agreement signed by Dr. Doe (redacted).  (Exh. 1 at 10-16.)  In that agreement, Dr. Doe authorized any physician, treatment center, clinic, or other health care provider "who has examined or treated [him] through the Program" to disclose information about his treatment to PRN in order to monitor his progress in the program.  (Exh. 1 at 14.)  Section 290dd-2(b)(1)(A) recognizes that protected information may be disclosed based on the patient's "written consent."  Implementing regulations prescribe several elements that must be present for written consent.  *See* 42 C.F.R. § 2.31(a).

The parties do not fully engage the issue of whether Dr. Doe gave written consent for the disclosure of his patient records.  Dr. Doe notes generally that regulations set out the requirements for effective consent, but he does not discuss any one of them or dispute that the Support Agreement meets them.  (*See* Dkt. No. 32 at 1.)  Instead, he focuses on arguing that the Support Agreement was not effective in

granting consent because he signed it under duress and later terminated the agreement.  And because the Board argues that its evidence does not contain Enterhealth records, it does not discuss whether the Support Agreement constitutes written consent for disclosure of records.

Upon review of the Support Agreement, the Court finds that the agreement contains many of the items required by § 2.31(a) for written consent.  For example, it contains Dr. Doe's name [(a)(1)] (Exh. 1 at 10); authorizes a treatment center [(a)(2)] to release "any and all" reports about his examinations or treatment [(a)(3)] to PRN [(a)(4)(i)] and also, upon his noncompliance with the program, to the Board [(a)(4)(ii)] (Exh. 1 at 14 ¶¶ 13(a)-(b)); Dr. Doe's signature [(a)(8)] and the date he signed it [(a)(9)] (Exh. 1 at 15-16); and it indicates when his consent terminates [(a)(7)] (*see* Exh. 1 at 10 ¶ 1).  The agreement also contains a description of the purpose for the disclosure [(a)(5)], at least as to PRN: "The purpose of this release is to provide records for monitoring my progress in the Program and compliance with this Agreement."  (Exh. 1 at 14 ¶ 13(a)).  The authorization acknowledges that PRN may disclose information to the Board if he does not comply with the program, but it does not expressly describe the purpose for that redisclosure or authorize use of the records in administrative proceedings related to his license.  *See* 42 C.F.R. § 2.31(d) (noting that consent to use records in a civil, criminal, administrative, or legislative investigation or proceeding "cannot be combined with a consent to use and disclose a record for any other purpose").

-14-

But at least one required component of written consent is patently missing from the Support Agreement. Section 2.31(a)(6) mandates that written consent contain a "patient's right to revoke the consent in writing, except to the extent that the part 2 program or other lawful holder of patient identifying information that is permitted to make the disclosure has already acted in reliance on it, and how the patient may revoke consent." The Court finds that the Support Agreement contains no provision that satisfies this requirement. It therefore does not qualify as written consent that enables disclosure under § 290dd-2(b)(1)(A).[6]

The Board suggests that the Court need not deeply consider whether its evidence must be excluded. (*See* Dkt. No. 36 at 4.) In its view, § 290dd-2 does not say anything about prohibiting a treatment center from informing a regulatory authority that a licensed professional might be a danger to the public, nor does it

---

[6] The Court notes two additional aspects of the Support Agreement that might disqualify it from satisfying § 2.31(a). First, the Support Agreement authorizes release by any treatment center that "examined or treated [Dr. Doe] through the Program[.]" (Exh. 1 at 14.) The Court questions whether Enterhealth was treating Dr. Doe "through the Program" when it made at least some of the disclosures to PRN. Evidence establishes that, unlike many cases in which a dentist enters treatment as a result of PRN participation, Dr. Doe voluntarily entered Enterhealth without any knowledge or involvement of PRN. Enterhealth arguably was not treating him "through the Program" before he signed the Support Agreement. Second, the regulation requires that a patient's consent to use or disclose records for "health care operations" also include statements about the potential that records may be redisclosed by the recipient and no longer protected and about the consequences of refusing to sign the consent. 42 C.F.R. § 2.31(a)(10). The parties do not discuss whether a redisclosure from PRN to the Board upon noncompliance—impliedly to determine his fitness to practice dentistry—is for "health care operations" such that the requirements in (a)(10) apply. If so, it does not appear the Support Agreement contains these provisions. Because the Court concludes that the Support Agreement does not satisfy the requirements for written consent under § 2.31(a) irrespective of these issues, it does not decide them.

preclude the use of its information in this type of proceeding as opposed to an administrative hearing to take action on Dr. Doe's license. (Tr. 7.) Relatedly, the Board argues that Dr. Doe could perhaps take action against Enterhealth for any unauthorized disclosure it made but that he cannot prevent the Board from using the information to show good cause in these proceedings. (Tr. 22.) These arguments ignore the plain language of the statute, which prevents protected information from being entered into evidence in any civil proceeding in a federal court. 42 U.S.C. § 290dd-2(c)(1). The instant proceedings are, of course, a civil action in a federal court. Despite the Board's assessment that it seems "a little weird" (Tr. 12) to exclude information in its possession that might be important to the administration of Dr. Doe's license, the statute makes clear that, absent an exception, the Court cannot consider protected information in assessing whether good cause is shown to disclose the protected information.

Based on the facts presented, the Court concludes that portions of the October 15, 2021 PRN letter to the Board fall within the definition of protected records under § 290dd-2(a), for which the Board has not established any exception. Specifically, the Court excludes and does not consider the information in Exhibit 1 beginning with the August 8, 2021 entry on Page 8 and continuing through the August 31, 2021 entry that extends onto Page 9.

In making its findings and conclusions with respect to good cause, the Court does consider the remainder of Exhibits 1, 2, and 4 and the testimony of Ms.

Sanchez.  The Court declines to adopt Dr. Doe's argument that other evidence should be excluded because he signed the Support Agreement under duress.  The Court has already determined that the Support Agreement does not constitute written consent, irrespective of his alleged duress.  And, as to the remainder of the evidence, which the Court has considered, Dr. Doe has not shown that it was obtained through duress.  Most salient is the information he provided to Turney during the PRN intake call.  (*See* Exh. 1 at 7-8.)  The only evidence submitted shows that an Enterhealth counselor contacted PRN and stated that she was attempting to help an unnamed dentist who was a patient there.  Turney recommended that the patient call him to complete an intake.  Dr. Doe called later that day, and he disclosed a considerable history of drug use and a lack of any prior treatment.  (Exh. 1 at 7.)  Nothing about these facts enable—much less persuade—the Court to find that Dr. Doe provided this information under duress.[7]

For the foregoing reasons, the Court grants Dr. Doe's November 25, 2025 Motion in Limine (Dkt. No. 32) with respect to the identified portions of Exhibit 1, pages 8 and 9, and it denies the motion in all other respects.

## IV.

The Court next considers whether the Board has made the necessary showing to authorize the disclosure of Enterhealth records.  It does so in two parts, assuming

---

[7] Dr. Doe was given an opportunity to present evidence supporting his assertion of duress, but he relied solely on the documents in Exhibit 1.  (*See* Tr. 15-20.)

the records sought contain both Dr. Doe's confidential communications and other records. *See In re Aug., 1993 Regular Grand Jury*, 854 F. Supp. 1380, 1384–86 (S.D. Ind. 1994) (considering separately the two categories of information). For records other than Dr. Doe's confidential communications, the Court considers whether the Board has established good cause using the standards expressed in 42 U.S.C. § 290dd-2(b)(2)(C) and 42 C.F.R. § 2.64(d). His confidential communications, however, are entitled to heightened protection, *see In re Aug., 1993 Regular Grand Jury*, 854 F. Supp. at 1385, and can be disclosed only upon an additional showing that "[t]he disclosure is necessary to protect against an existing threat to life or of serious bodily injury[.]" 42 C.F.R. § 2.63(a)(1)[8]; *see also Fannon*, 88 F. Supp. 2d at 758 ("[I]f the information sought contains 'confidential communications,' [the party requesting disclosure] must satisfy both the 'good cause' requirements of § 290dd-2(b)(2)(C) and the requirements of [§ 2.63(a)].").

## A.

The Court first assesses whether the Board has shown good cause under § 290dd-2(b)(2)(C) and § 2.64(d). Section 290dd-2(b)(2)(C) instructs that showing good cause includes establishing a "need to avert a substantial risk of death or serious bodily harm." The implementing regulation requires the Court to additionally find that "(1) [o]ther ways of obtaining the information are not available or would not be

---

[8] Neither party asserts that subsections (a)(2) or (a)(3) are relevant to these proceedings.

effective; and (2) [t]he public interest and need for the use or disclosure outweigh the potential injury to the patient, the physician-patient relationship and the treatment services."  42 C.F.R. § 2.64(d).[9]

The Court finds that the first element is met.  The Board is responsible for regulating the practice of dentistry in Texas, including by monitoring and taking action against the licenses of dentists who are unsafe to practice due to alcohol or substance abuse.  The practice of dentistry by professionals who are addicted to or regularly use controlled substances carries obvious risk to the health and safety of the public.  Dr. Doe disclosed during the PRN intake call that he had been using a controlled substance daily for years, had a significant history of other substance abuse, and had never received treatment.  Additionally, once they learned of his substance use, his dental assistants helped him find an inpatient treatment center, which supports an inference that they considered his drug use serious.  These facts sufficiently establish that Dr. Doe's continued practice of dentistry presents a

---

[9] The Court recognizes that others have assessed the existence of good cause based only on the two considerations listed in 42 C.F.R. § 2.64(d).  *See, e.g.*, *Wachel v. First Colony Life Ins. Co.*, No. 2:05-CV-292-PRC, 2005 WL 8170419, at *2 (N.D. Ind. Dec. 7, 2005); *Doe v. Marsh*, 899 F. Supp. 933, 934 (N.D.N.Y. 1995).  These decisions, however, do not address statutory language suggesting that the need to avert a risk of death or bodily harm is an inherent part of good cause.  *See* 42 U.S.C. § 290dd-2(b)(2)(C) (noting the application must show good cause for disclosure, "including the need to avert a substantial risk of death or serious bodily harm").  In the absence of party briefing and deep argument on this issue, the Court accepts for the sake of this case only that the statutory language creates an additional element for showing good cause generally under § 2.64.

-19-

substantial risk of harm that the Board is attempting to mitigate through the administration of his license.

Dr. Doe's status as informally retired does not change the Court's finding. While there is no dispute that he has not seen patients since the Board proceedings began, it is also undisputed that his license remains active and that there is no barrier to him resuming the practice at any time.[10]

The Court next considers whether the Board has shown that other ways of obtaining the information are unavailable or would not be effective. The Board suggests there are no alternative sources for the information sought. Dr. Doe, however, argues that the Board has at its disposal state procedures whereby it could force him to undergo a substance abuse evaluation. But the information the Board presumably seeks goes well beyond a substance abuse evaluation, to include the types and intensity of Dr. Doe's past treatment, the length of his participation and levels of success achieved, and evaluations by therapists engaged in his treatment. A new evaluation would not provide this information, and there has been no showing that an alternative exists. Moreover, the Board has attempted to obtain this information during state administrative proceedings but has been unable to do so. The Court finds that this element is met.

---

[10] Even if Dr. Doe had submitted the papers necessary to move his license into retired status, testimony established that he would still be able to practice dentistry in limited circumstances. (Tr. 24-25, 60-61.)

Finally, the Court weighs the public interest and need for the disclosure of the information sought against the potential injury to Dr. Doe, his treatment, and the relationship with his treatment provider. The Board has a fundamental duty to protect the public by regulating the practice of dentistry and ensuring that its licensees are safe to practice. A dental healthcare provider who is addicted to or habitually using controlled substances can pose a serious risk to the health and safety of the public. Accordingly, the public's interest in and need for disclosure are strong, and they outweigh any potential injury to Dr. Doe. There is no ongoing treatment with which a disclosure would interfere, nor any ongoing physician-patient relationship with Enterhealth that would be undermined. *See Doe v. St. Vincent Med. Grp., Inc.*, No. 19 C 3777, 2019 WL 6125291, at *3 (N.D. Ill. Nov. 18, 2019). (Tr. 108.) The Court finds that these factors weigh in favor of good cause.

Based on the evidence presented, the Court concludes that the Board has shown good cause under § 2.64(d) to justify disclosure of patient records. The Court therefore grants the Board's request for the disclosure of Enterhealth treatment records for Dr. Doe.

**B.**

The Court next determines whether the Board has made the heightened showing necessary to obtain disclosure of the portion of the Enterhealth records that are Dr. Doe's confidential communications. To make this showing, the Board must demonstrate that disclosure of Dr. Doe's confidential communications is "necessary

to protect against an existing threat to life or of serious bodily injury." 42 C.F.R.

§ 2.63(a)(1). Two parts of the guiding standard warrant discussion. First, it is

insufficient for the requesting party to show that the disclosure of these

communications is merely relevant or helpful to protecting against a safety risk. *Cf.*

*Mosier*, 170 F. Supp. 2d at 1214 (showing good cause requires more than relevance

under discovery rules). Rather, it must be shown that disclosure is *necessary*. Second,

unlike the good-cause standard, which might be satisfied by a generalized but

substantial risk, a party requesting confidential communications must show an

"existing threat" to life or of serious bodily injury. These facets of § 2.63(a)(1)

persuade the Court that those records that are a patient's confidential

communications to the treatment provider are afforded a level of protection that is

practically absolute absent written consent or a compelling need to protect against a

specific threat of physical harm.

The Board rests on its good-cause showing generally and does not separately

argue that its evidence also satisfies § 2.63(a)(1). The Court finds that the evidence

before it does not meet the high burden necessary to justify disclosure of Dr. Doe's

confidential communications within the Enterhealth records. The Court's prior

ruling with respect to non-communication records enables the Board to obtain

Enterhealth's records that document, for example, the fact of Dr. Doe's treatment;

the dates, modality, and intensity of his treatment; his completion or unsatisfactory

termination of treatment; and treatment providers' evaluations of his participation,

disorder, and risk.  But the Board has not explained how, notwithstanding all of this information, it also needs Dr. Doe's confidential communications to his therapists in order to protect against a threat of serious physical harm.  Nor has the Board proved that there is an existing threat, as opposed to a mere possibility that he might practice in the future.

Based on the evidence presented, the Court finds that the Board has not proved that the use or disclosure of Dr. Doe's confidential communications is necessary to protect against an existing threat to life or of serious bodily injury.  It therefore denies the Board's request for Enterhealth records that are Dr. Doe's confidential communications.

## V.

### A.

The Court turns to Dr. Doe's request that any order authorizing disclosure also expressly preclude the Board from using the records to revoke his license.  At the hearing, he argued that the Court may impose such a limitation under 42 C.F.R. § 2.64(e), which allows a court to include measures "to limit use or disclosure" of the information.  42 C.F.R. § 2.64(e)(3).  (Tr. 107.)  After examining this regulatory provision in context, the Court concludes that it is unable to impose the limitation that Dr. Doe requests.

The regulatory provision that Dr. Doe relies on ensures that records disclosed pursuant to a court order do not lose all of their confidentiality protections.

Subsections (e)(1) and (e)(2) direct a court to limit the breadth of the information released and the recipients who can receive it.  Subsection (e)(3), then, instructs the court to limit use or disclosure of the information "for the protection of the patient, the physician-patient relationship and the treatment services," pointing to sealing the record of any proceedings in which the information is used as one such limitation. 42 C.F.R. § 2.64(e)(3).  Viewed in context, it is evident that subsection § 2.64(e) authorizes a court to regulate the dissemination of disclosed records.  But it does not enable a court to control the substantive decisions made by those authorized to receive the records.  So, for example, the regulation enables the Court to enjoin the Board from redisclosing records to criminal investigators or to mandate that the records be sealed in proceedings before the SOAH.  But the regulation does not authorize the Court to limit the decisions the Board may reach with respect to Dr. Doe's license.

## B.

Finally, the Court makes clear that its order only authorizes Enterhealth to disclose records that are otherwise protected by § 290dd-2(a).  It does not compel it to do so.  *See* 42 U.S.C. § 2.61(a).  To compel production, the Board must obtain a subpoena or other legal mandate obligating Entherhealth to produce the records that are authorized for disclosure.

-24-

## IV.

The Court grants in part and denies in part Dr. Doe's motion in limine (Dkt. No. 32) as explained herein.  After considering the admissible evidence and applicable authority, the Court grants the Board's petition as to Enterhealth's treatment records pertaining to Dr. Doe, except that it denies the petition with respect to records that are Dr. Doe's confidential communications.  Enterhealth is authorized to release its treatment records to the Board but must withhold or redact Dr. Doe's confidential communications to treatment providers made in the course of diagnosis, treatment, or referral for treatment.

**SO ORDERED** on December 29, 2025.

_____
BRIAN McKAY
UNITED STATES MAGISTRATE JUDGE